IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southpointe Golf Club, Inc.      :
     :
     v.     :
     :
Board of Supervisors of Cecil Township,:
and Southpointe Golf Club, Inc.      :
     :
     v.     :
     :
Zoning Hearing Board of Township      :
of Cecil      :
     :     No. 148 C.D. 2020
Appeal of:  Southpointe Golf Club, Inc.  :     Argued:  October 13, 2020

BEFORE:     HONORABLE ANNE E. COVEY, Judge
     HONORABLE CHRISTINE FIZZANO CANNON, Judge
     HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE FIZZANO CANNON     FILED:  February 19, 2021

Southpointe Golf Club, Inc. (Golf Club) appeals from the January 14, 2020 Memorandum and Order of the Court of Common Pleas of Washington County (trial court) denying Golf Club's challenge to the procedural validity of Cecil Township's Unified Development Ordinance 11-2016 (Ordinance 11-2016) and affirming the denial by the Cecil Township Zoning Hearing Board (ZHB) of Golf Club's challenge to the substantive validity of Ordinance 11-2016.[1]  Upon review, we reverse.

---

[1] Appeals of procedural validity challenges are filed directly with the courts of common pleas.  *See* Section 1002-A(b) of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of Dec. 21, 1988, P.L. 1329, 53 P.S. § 11002-A(b) ("Challenges to the validity of a land use ordinance raising procedural questions or

## I. Background and Procedural Posture

Golf Club's real property (Golf Club Property) consists of 8 parcels totaling 188 acres located within a mixed-use development called Southpointe in Cecil Township, Washington County (Township). *See* Trial Court Decision at 2. The Southpointe development constitutes the entirety of Township's Special Development (SD) District per Township's Unified Development Ordinance (UDO) No. 5-00, enacted on May 17, 2005. *See id.* The Southpointe development / SD District consists of approximately 825 acres that were developed in 2 phases, Southpointe I and Southpointe II. *See id.* The Golf Club Property lies within Southpointe I and is surrounded by 160 other parcels of mixed zoning classifications, all of which have been developed.[2] *See id.*

Originally, and throughout much of the historical development of Southpointe, UDO Section 913.F allowed a property owner to change the use of property located within the SD District by applying for a conditional use. UDO Ordinance 913.F (Section 913.F), Reproduced Record (R.R.) at 65a; *see also* Trial Court Decision at 3-4. However, in the Spring of 2016, Township enacted Ordinance 1-2016, amending Section 913.F, in order to prevent Southpointe property owners from changing their property uses to less restrictive classifications. *See* Trial Court Decision at 5-7. Ordinance 1-2016 purported to amend the SD District's conditional use application process to add certain objective standards to

alleged defects in the process of enactment or adoption shall be raised by appeal taken directly to the court of common pleas . . . ."). Substantive validity challenges are filed with zoning hearing boards. *See* Section 909.1(a) of the MPC, added by Act of Dec. 21, 1988, P.L. 1329, 53 P.S. § 10909.1(a) (zoning hearing boards have exclusive jurisdiction to hear and render final adjudications in substantive challenges to the validity of any land use ordinance).

[2] Specifically, the properties that surround the Golf Club Property include 3 industrial properties, 15 commercial properties, and 142 residential properties. *See* Trial Court Decision at 2.

proposed changes of land use categories or land use for individual properties as follows:

> 2. Developed Lots or Parcels
>
> a. Any proposed change in the land use category or land use of a Developed lot or parcel in a recorded plan of subdivision shall be addressed as follows:
>
>> i. Owner shall submit [a] conditional use application proposing a revision to the Illustrative Site Plan.
>>
>> ii. In addition to the Conditional Use factors set forth in the Ordinance, the following objective standards must be met by the applicant to receive Conditional Use Approval:
>>
>>> 1. The proposed Land Use Category must be a More Restrictive Land Use Category[3] than the existing Land Use Category (e.g., a Residential Land Use Category cannot be changed to a Commercial Land Use Category or an Industrial Land Use Category);

---

[3] Ordinance 1-2016 defined "More Restrictive Land Use Category" as follows:

> iii. The term "More Restrictive Land Use Category" shall mean a land use category which is considered milder in terms of effects and impacts on adjacent and neighboring properties. The Residential Land Use Category shall be deemed a More Restrictive Land Use Category than the Commercial Land Use Category which, in turn, is a More Restrictive Land Use Category than the Industrial Land Use Category.
>
> iv. The term "More Restrictive Land Use" shall mean MORE RESTRICTIVE USE as defined in Section 202 of the [UDO].

Ordinance 1-2016 at 4; R.R. at 73a. The UDO, in turn, defined "More Restrictive Use" as "[a] use which is considered milder in terms of effects and impacts on adjacent and neighboring properties, such as a professional office use would be considered less severe (more restrictive) than a gasoline service station use in the C-1 District." UDO at 38; R.R. at 46a.

2. The proposed Land Use must be a More Restrictive Use than the existing Land Use (e.g., in a Residential Land Use Category, a Community or private membership outdoor recreational facility cannot be replaced with a Single-Family Dwelling, a Home Office, a Farm or an Essential Service).

3. *These additional standards may be waived by the Board of Supervisors, in their [sic] sole discretion, if applicant submits a petition signed by 100% of the adjacent property owners, within and outside the SD District, consenting to the proposed change* in the Land Use Category and/or Land Use.[4]  The petition must include as an attachment a copy of the revised Illustrative Site Plan and a description of the proposed change which must be presented to and explained to the adjacent landowner.  Any adjacent landowner may revoke their consent at any time.

Ordinance 1-2016 at 2-3, R.R. at 71a-72a; *see also* Trial Court Decision at 8-9 (emphasis added).  Further, in its definition section, Ordinance 1-2016 created a hierarchy, or "ladder," of restrictive residential land uses that listed "[c]ommunity or private membership outdoor recreational facilities" as the most restrictive use included in the category of More Restrictive Land Use for Residential Land Uses. Ordinance 1-2016 at 4; R.R. at 73a.  Golf Club was, and remains, the only community or private membership outdoor recreational facility in the SD District. *See* Trial Court Decision at 9-10.

---

[4] Ordinance 1-2016 required a petition signed by 51% of adjacent owners to change the land use category or land use of a vacant lot or parcel.  *See* Ordinance 1-2016 at 2; R.R. at 71a.

4

Township conducted public hearings regarding the proposed adoption of Ordinance 1-2016 on March 14, 2016, and April 5, 2016. Township advertised a final hearing for Monday, May 3, 2016, at which the Supervisors would vote on the adoption of Ordinance 1-2016; however, May 3, 2016, was actually a Tuesday. *See* Trial Court Decision at 5-6. Thereafter, and despite the date error in Township's hearing advertisement, on Monday, May 2, 2016, Township's Supervisors met and conducted the final hearing on Ordinance 1-2016. *See id.* at 6. Only the Supervisors and Township's solicitor participated in the hearing, directly following which the Supervisors unanimously adopted Ordinance 1-2016. *See id.*

On May 31, 2016, Golf Club filed substantive and procedural challenges to Ordinance 1-2016. *See* Trial Court Decision at 10. The procedural challenges consisted of allegations that Township (i) published the incorrect date of the hearing to consider Ordinance 1-2016, (ii) failed to post the Golf Club Property, and (3) failed to mail notice to Golf Club. *See id.* Golf Club's substantive challenge alleged that Ordinance 1-2016 amounted to spot zoning. *See id.* at 10-11.

In response to Golf Club's challenges, on July 1, 2016, Township proposed and submitted Ordinance 11-2016 to the Washington County Planning Commission, repealing and reenacting Ordinance 1-2016, with minor amendments making the ordinance less restrictive. Ordinance 11-2016 at 2-3, R.R. at 77a-78a; *see* Trial Court Decision at 11. Like Ordinance 1-2016, Ordinance 11-2016 proposed to amend the SD District's conditional use application process to add objective standards to the UDO's existing conditional use standards for proposed changes of land use categories or land use for individual properties. *See* Ordinance 11-2016, Section 913.F.2, R.R. at 79a-80a. Ordinance 11-2016 purported to delete

5

the previous Section 913.F.2 and replace it, in pertinent part, with the following provision:

2. Developed Lots or Parcels

a. Any proposed change in the land use category or land use of a Developed lot or parcel in a recorded plan of subdivision shall be addressed as follows:

i. Applicant shall submit an application form proposing a revision to the Illustrative Plan Site. Applicant may use the Township's Conditional Use Application Form.

ii. The Board of Supervisors shall consider the following factors in evaluating such an application:

1. If the proposed Land Use Category is a More Restrictive Land Use Category, the Board shall evaluate the request pursuant to the Conditional Use factors set forth in this Ordinance.

2. If the proposed Land Use Category is a Less Restrictive Land Use Category, the Board shall evaluate the request pursuant to the factors set forth in Section 402.E and 402.F of the [UDO], entitled "Ordinance Amendments and Rezoning Applications," as amended[.]

3. If the proposed Land Use is a Less Restrictive Land Use than the Existing Land Use, the Board shall evaluate the request pursuant to the factors set forth in Section 402.E and 402.F of the [UDO], entitled "Ordinance Amendments and Rezoning Applications," as amended.

4. Changes to a More Restrictive Land Use do not require the submission of an application or approval of the Board of Supervisors.

6

> *5. These additional standards may be waived by the Board of Supervisors, in their sole discretion, if Applicant submits a petition signed by 100% of the adjacent property owners, within and outside the SD District, consenting to the proposed change* in the Land Use Category and/or Land Use.[5] The petition must include as an attachment a copy of the revise Illustrative Site Plan and a description of the proposed change which must [be] presented to and explained to the adjacent landowner. Any adjacent landowner may revoke their consent at any time.

> iii. The Board of Supervisors is not obligated to permit a change in Land Use Category or Land Use.

Ordinance 11-2016, Section 913.F.2, R.R. at 78a-79a; *see also* Trial Court Decision at 17-18 (emphasis added). Further, as in Ordinance 1-2016, in its definition section, Ordinance 11-2016 again created a "ladder" of restrictive residential land uses that identified "[c]ommunity or private membership outdoor recreational facilities" as the most restrictive More Restrictive Land Use for Residential Land Uses. Ordinance 11-2016, Section 913F.3, R.R. at 80a; *see also* Trial Court Decision at 19. In short, Ordinance 11-2016 requires that the Board of Supervisors evaluate applications to a change to a less restrictive Land Use Category or Land Use within the SD District by applying the UDO's rezoning standards. Like Ordinance 1-2016, Ordinance 11-2016 further provides that the Board may exercise its discretion to waive such standards, but only with the consent of all adjacent landowners, any one

---

[5] Like Ordinance 1-2016, Ordinance 11-2016 requires a petition signed by 51% of adjacent property owners to change the land use category or land use of a vacant lot or parcel. *See* Ordinance 11-2016, Section 913.F.1.a.i, R.R. at 78a.

of whom may withdraw such consent at any time. *See* Ordinance 11-2016, Section 913.F.2.a.ii.5, R.R. at 79a; Trial Court Decision at 20.

On July 11, 2016, Township's Board of Supervisors conducted a public hearing on the proposed enactment of Ordinance 11-2016.[6] *See* Trial Court Decision at 11. At that hearing, Golf Club again raised procedural challenges alleging deficiencies in the advertising and the notice it received for that hearing, as well as substantive challenges to alleged deficiencies in the proposed text of Ordinance 11-2016. *See id.* at 12.

Golf Club presented the testimony of its representative, Mike Swisher, who testified regarding the alleged deficient notification of the July 11, 2016 hearing as well as the historical development of the Southpointe development and the previously-employed conditional use process for the subdivision and development of the Golf Club Property. *See id.* Additionally, Golf Club presented the expert testimony of certified land planner John Trant, Jr., who opined that Ordinance 11-2016 would effectively rezone the Golf Club Property by reducing the previous 58 uses available to Golf Club for the use of the Golf Club Property to only one. *See id.* at 12-13. Mr. Trant also testified that by limiting the Golf Club Property to a single use, the hierarchy of restrictive uses contained in Ordinance 11-2016 amounted to impermissible spot zoning. *See id.* at 13.

On July 18, 2016, the ZHB conducted a hearing on Golf Club's substantive validity challenge to Ordinance 1-2016. *See* Trial Court Decision at 14.

---

[6] Township's Chairman indicated that Township convened the July 11, 2016 hearing as a result of the incorrect advertised date of the May 2, 2016 hearing on Ordinance 1-2016, which was one of Golf Club's procedural challenges to Ordinance 1-2016. *See* Trial Court Decision at 11. The recitations at the beginning of Ordinance 11-2016 explain that the Township decided to repeal and replace Ordinance 1-2016 in order to cure any procedural defects concerning its enactment. Ordinance 11-2016 at 1-2; R.R. at 77a-78a.

8

Golf Club again argued at this hearing, as it had at the July 11, 2016 hearing on Ordinance 11-2016, that Ordinance 1-2016 constituted spot zoning by limiting the Golf Club Property to a single use. *See id.* Likewise, Messrs. Swisher and Trant reiterated their testimony presented the previous week to Township's Board of Supervisors regarding Ordinance 11-2016. *See id.*

On August 15 and 22, 2016, Township published advertisements for a second hearing before the Board of Supervisors on Ordinance 11-2016 on September 6, 2016, to consider changes to the proposed ordinance in light of information provided at the previous hearing. *See* R.R. at 185a; Trial Court Decision at 16-17. This second hearing concerning the proposed enactment of Ordinance 11-2016 occurred as scheduled on September 6, 2016. *See* Trial Court Decision at 17. Golf Club again asserted procedural notice and advertising deficiencies as well as a substantive challenge arguing that Ordinance 11-2016 amounted to spot zoning. *See* Trial Court Decision at 20-21. Mr. Swisher again testified and noted numerous less restrictive commercial uses adjacent to Golf Club, or constructed upon property previously subdivided from Golf Club, that would not be eligible for approval under Ordinance 11-2016. *See id.* at 21. Golf Club also submitted Mr. Trant's report concluding that Ordinance 11-2016 (1) circumvented the rezoning procedures contained in the MPC, by authorizing an approval process not contemplated by the MPC; (2) gave the Board authority it did not possess under the MPC; and (3) authorized *de facto* zoning by referendum. *See id.* The Board of Supervisors enacted Ordinance 11-2016 at the conclusion of the September 6, 2016 hearing. *See id.* at 22.

On October 6, 2016, the Golf Club filed a procedural challenge to Ordinance 11-2016 with the trial court and a substantive validity challenge to

Ordinance 11-2016 with the ZHB.[7] *See* Trial Court Decision at 23. On December 19, 2016, the ZHB heard Golf Club's substantive validity challenge. *See id.* Golf Club again argued that Ordinance 11-2016 singled out the Golf Club Property and effectively prohibited any changes of use thereon. *See id.* at 23-24. Mr. Swisher testified that sufficient infrastructure existed to develop the Golf Club Property in the future for industrial, commercial, or residential uses. *See id.* at 24. Mr. Trant also testified again and explained that the Golf Club Property is virtually indistinguishable from the surrounding properties and, therefore, no reason or rationale supports treating the Golf Club Property differently from adjoining properties. *See id.* Mr. Trant testified that Section 913.F.2 of Ordinance 11-2016 is contrary to the MPC because it gives the Board of Supervisors discretion to waive requirements of the UDO and/or allow adjoining landowners to effectuate a land use application with its approval. *See id.* at 25. Mr. Trant concluded that Ordinance 11-2016 has the sole purpose of locking in the use of the Golf Club Property as a golf course. *See id.*

The ZHB denied Golf Club's substantive validity challenge on May 3, 2017. *See* Trial Court Decision at 25. The ZHB determined that the original version of Section 913.F inadequately protected the interests of the landowners adjacent to the Golf Club, and that Ordinance 11-2016 protects Golf Club's neighboring residents, who chose to purchase property in Southpointe because they were

---

[7] On September 6, 2016, the ZHB issued a decision granting, in part, Golf Club's substantive validity challenge to repealed Ordinance 1-2016. *See* Trial Court Decision at 22. Because the Board of Supervisors did not receive substantial evidence to support Ordinance 1-2016's "ladder" ranking categories, the ZHB found Ordinance 1-2016 to be arbitrary. *See id.* The ZHB determined, however, that Ordinance 1-2016 was a valid exercise of Township power that did not represent spot zoning, special legislation, or an unconstitutional deprivation of Golf Club's rights. *See id.* Golf Club appealed the ZHB's determination regarding Ordinance 1-2016 to the trial court on October 19, 2016. *See id.* at 23.

promised a "live, work, and play" community. *See id.* at 26. As such, the ZHB concluded that Ordinance 11-2016 is based upon legitimate health, welfare, and safety concerns of SD District property owners. *See id.* at 27. The ZHB further found that the UDO contained standards that would permit a change of zoning and that the Golf Club Property is therefore not "frozen" because it has available to it a procedure that would allow for a change of use. *See id.* at 26. Ultimately, the ZHB ruled that Ordinance 11-2016 is a valid exercise of Township's legislative power, not spot zoning, and does not amount to zoning by referendum. *See id.*

Golf Club appealed the ZHB's May 3, 2017 decision to the trial court on June 2, 2017. The trial court consolidated Golf Club's Ordinance 1-2016 and Ordinance 11-2016 procedural challenges, which had been brought directly in the trial court, with Golf Club's Ordinance 1-2016 and Ordinance 11-2016 substantive validity challenges appealed from the ZHB. On January 14, 2020, the trial court denied Golf Club's procedural challenge that had been brought before the trial court directly and also affirmed the ZHB's denial of Golf Club's challenge to the substantive validity of Ordinance 11-2016. *See generally* Trial Court Decision.

Regarding Ordinance 1-2016,[8] the trial court determined that Ordinance 1-2016 was procedurally invalid and therefore void *ab initio* based on Township's defective notification and advertising of meetings at which Ordinance 1-2016 was to be considered. *See* Trial Court Decision at 29-31. As a result, the trial court denied Golf Club's Ordinance 1-2016 substantive validity challenge as moot. *See id.* at 31 n.87.

The trial court found that Township had not violated any statutory procedures in enacting Ordinance 11-2016, and accordingly denied Golf Club's

_____

[8] The trial court's rulings on Ordinance 1-2016 are not at issue in this appeal.

11

procedural challenge. *See id.* at 33-50. The trial court also denied Golf Club's substantive validity challenge to Ordinance 11-2016. *See id.* at 50-65. The trial court found that Ordinance 11-2016 does not unlawfully delegate zoning authority to Golf Club's adjoining property owners. *See id.* at 55-60. The trial court determined that the provision allowing for waiver of the Additional Standards for consideration in changes of a Land Use Category and/or a Land Use within the SD District upon the submission of a petition signed by 100% of adjacent property owners[9] is permissive and retains the authority of the Board of Supervisors to apply the appropriate criteria to an application to change Land Use Category or Land Use. *See id.* at 55. The trial court found that this portion of Ordinance 11-2016 "may be viewed as a practical means to avoid violations of other MPC procedural safeguards" and is not an unlawful delegation of Township's police power. *Id.* at 55-56. Additionally, the trial court also determined that Ordinance 11-2016 does not specifically target Golf Club or permanently restrict it to its present use. *See id.* at 61. Accordingly, the trial court found that Ordinance 11-2016 does not represent spot zoning. *See id.* at 61-65. This appeal followed.

## II. Issues

Golf Club raises three claims on appeal.[10] First, Golf Club claims that Ordinance 11-2016 is invalid and void *ab initio* due to Township's failure to strictly comply with the MPC's procedural requirements. *See* Golf Club's Brief at 3, 33-42. Second, Golf Club alleges Ordinance 11-2016 constitutes unlawful spot zoning and

---

[9] Ordinance 11-2016, Section 913.F.2.a.ii.5, R.R. at 80a.

[10] "Where, as here, the trial court takes no additional evidence, our scope of review is limited to determining whether the [zoning hearing b]oard committed an abuse of discretion or an error of law." *425 Prop. Ass'n of Alpha Chi Rho, Inc. v. State Coll. Borough Zoning Hearing Bd.*, 223 A.3d 300, 307 (Pa. Cmwlth. 2019), *appeal denied*, 236 A.3d 1047 (Pa. 2020).

is substantively invalid because it singles out the Golf Club Property and perpetually prevents development or change in use from a golf club. *See id.* at 3, 43-49. Third, Golf Club claims Ordinance 11-2016 subverts established municipal zoning and land use processes and unlawfully delegates Township's legislative authority to property owners by allowing zoning by referendum of the owners of properties adjacent to the Golf Club Property and allowing any owner to revoke consent to a proposed development at any time. *See id.* at 3, 50-53.

### III. Discussion

We address Golf Club's third issue first, as it is dispositive. We agree with Golf Club that by allowing consent from 100% of adjoining property owners – consent any owner may revoke at any time – to trigger the option of the Board of Supervisors to exercise its discretion to waive zoning requirements, Ordinance 11-2016 constitutes an impermissible delegation of zoning authority to Golf Club's adjacent property owners. *See* Golf Club's Brief at 50-53.

Zoning, as an exercise of police power, "is permitted when exercised for the promotion of the health, safety, morals or general welfare of the community." *Nat'l Land & Inv. Co. v. Kohn*, 215 A.2d 597, 602 (Pa. 1965). "Regulations adopted pursuant to that power must not be unreasonable, arbitrary or confiscatory." *Id.* at 607. Further, zoning legislation must benefit the public welfare, and may not be employed to effectuate purely private preferences. *See id.* at 611 (property owners' desire to look out over open land as opposed to other houses, while understandable and quite natural, represents a private desire that does not rise to the level of public welfare).

Under the MPC, the power to legislate zoning is reserved to municipalities' governing bodies. *See Haverford Twp. v. Zoning Hearing Bd. of*

13

*Haverford Twp.*, 344 A.2d 758, 761 (Pa. Cmwlth. 1975) ("rezoning is a purely legislative function reserved to the governing body under section 601 of the MPC"). The MPC does not contain any provision authorizing municipalities to delegate their zoning powers. *See generally* MPC.

This Court discussed the delegation of zoning authority in *425 Property Association of Alpha Chi Rho, Inc. v. State College Borough Zoning Hearing Board*, 223 A.3d 300 (Pa. Cmwlth. 2019), *appeal denied*, 236 A.3d 1047 (Pa. 2020). We explained the principles of the Pennsylvania Constitution[11] limiting delegation of zoning authority, as follows:

> Under Article II, Section 1 of the Pennsylvania Constitution, "[t]he legislative power of the Commonwealth shall be vested in a General Assembly." Pa. Const. art. II, § 1. Therefore, "when the General Assembly empowers some other branch or body to act, our jurisprudence requires that the basic policy involved in legislative power actually be made by the legislature as constitutionally mandated." *Protz v. Workers' Comp[.] Appeal B[d.] (Derry Area Sch[.] Dist[.])*, . . . 161 A.3d 827, 833 ([Pa.] 2017) (internal quotation marks omitted). This is to ensure that "duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate," and also "to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power." *Id.*
>
> In general, although the Pennsylvania Constitution "forbids the delegation of 'legislative power,' it nonetheless permits the General Assembly, in some

---

[11] In earlier jurisprudence, Pennsylvania courts relied on United States Supreme Court cases applying similar nondelegation principles founded on the Fourteenth Amendment to the United States Constitution. *See, e.g.*, *Appeal of Perrin*, 156 A. 305 (Pa. 1931) (citing and discussing *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116 (1928), and *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526 (1916)).

14

instances, to assign the authority and discretion to execute or administer a law." *Id.* However, the Supreme Court has concluded the Constitution imposes two fundamental limitations on the General Assembly's ability to do so. *Id.* at 834. First, "the General Assembly must make the basic policy choices, and second, the legislation must include adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Id.* (internal quotation marks omitted). This means that "the law must contain some intelligible principle to which the person or body authorized to act is directed to conform." *Id.* (internal quotation marks omitted). As our Supreme Court has held, a permissible delegation of legislative authority must include concrete measures to channel the delegatee's discretion and safeguards to protect against arbitrary, *ad hoc* decision making, such as a requirement that the delegate hold hearings, allow for public notice and comment, or explain the grounds for its decision in a reasoned opinion subject to judicial review. *Id.* at 835. *This Court has held that the non-delegation principle applies equally to a municipality's ability to delegate administrative functions to a third party. See City of Williamsport Bureau of Codes v. DeRaffele*, 170 A.3d 1270, 1275 (Pa. Cmwlth. 2017).

In *Protz*, the [Pennsylvania] Supreme Court addressed the constitutionality of a provision in the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710, that required physicians performing impairment rating evaluations of workers' compensation claimants to apply the methodology provided in the "most recent edition" of the American Medical Association (AMA) Guides to the Permanent Evaluation of Permanent Impairment (Guides). *Protz*, 161 A.3d at 830-31. The Supreme Court concluded that the General Assembly's delegation of authority to the AMA failed to provide any of the necessary safeguards. *Id.* at 835. In particular, the Court concluded that "the General Assembly did not favor any particular policies relative to the Guides' methodology for

15

grading impairments, nor did it prescribe any standards to create such a methodology." *Id.* Without any parameters, the AMA would be free to adopt any formula for impairment ratings and could change the formula at will, potentially with such frequency that no one could keep up with the changes, or alternatively, with such infrequency as to fall behind recent medical advances. *Id.* The Court also found that the General Assembly did not include any of the procedural mechanisms that are considered necessary to protect against "administrative arbitrariness and caprice," such as requiring the AMA to "hold hearings, accept public comments, or explain the grounds for its methodology in a reasoned opinion, which then could be subject to judicial review." *Id.* at 836. Thus, the Court concluded that the General Assembly unconstitutionally delegated lawmaking authority to the AMA. *Id.* at 838.

*425 Prop. Ass'n*, 223 A.3d at 313 n.9 (emphasis added). Adhering to our Supreme Court's decision in *Protz*, this Court explained in *425 Property Association* that State College Borough's zoning code unconstitutionally delegated authority to determine the existence of a fraternity house for zoning purposes to Penn State University, where the zoning code's definition of "fraternity house" was subject to Penn State University's recognition of an organization as a fraternity or sorority "through [Penn State's] procedures as may be established from time to time." *Id.* Similar to our Supreme Court's analysis in *Protz*, this Court noted that

the [State College Borough] [z]oning [o]rdinance provides none of the necessary safeguards to guide and restrain the exercise of the administrative functions delegated to Penn State. Specifically, the [z]oning [o]rdinance neither outlines the policy preferences favored by the Borough with respect to fraternity recognition, nor provides standards to guide Penn State in determining its recognition of fraternities as it relates to the [z]oning

16

> [o]rdinance. Under the [z]oning [o]rdinance, Penn State has sole and unbridled discretion regarding the recognition of fraternities and may revoke recognition at will. There are also no procedural mechanisms in the [z]oning [o]rdinance to protect against Penn State exercising administrative arbitrariness and caprice. Accordingly, because the Borough's delegation of authority to Penn State contained none of the fundamental limitations that our Supreme Court has deemed necessary to pass constitutional muster, were we to address the issue, we would be constrained to conclude that section 201 of the [z]oning [o]rdinance constitutes an unconstitutional delegation of lawmaking authority.

*425 Prop. Ass'n*, 223 A.3d at 313 n.9 (internal citations and quotation marks omitted).

This Court's reasoning expressed in *425 Property Association* was consistent with our Supreme Court's somewhat analogous decision in *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth of Pennsylvania*, 877 A.2d 383 (Pa. 2005). In *Gambling Expansion Fund*, a statutory provision gave the Pennsylvania Gaming Control Board authority to ignore local zoning ordinances in deciding where to locate slot machine casinos. The Court concluded the provision constituted an unconstitutional delegation of legislative authority because it failed to impose "definite standards, policies and limitations to guide [the Gaming Board's] decision-making with regard to zoning issues." *Id.* at 418. The *Gambling Expansion Fund* Court contrasted the permissible delegation of authority at issue in *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975), which assigned to courts the determination of whether a tax was unreasonable. That delegation of authority was appropriately limited, in that courts must explain their decisions in reasoned opinions that are subject to

17

precedents and to appellate review; such safeguards protect from arbitrary, *ad hoc* decisions and uncontrolled discretion. *Gambling Expansion Fund*, 877 A.2d at 418 (citing *William Penn Parking Garage*, 346 A.2d at 291-92).

The Township cites *Appeal of Perrin*, 156 A. 305 (Pa. 1931), to support its contention that the subject consent provision in the case *sub judice* is not an unconstitutional delegation of zoning authority. However, *Perrin* is readily distinguished. In *Perrin*, a local ordinance contained a provision precluding gas stations in residential areas except with the consent of a majority of the neighboring property owners. Our Supreme Court acknowledged and explained, at length, the general prohibition against delegation of a municipality's zoning power:

> When zoning ordinances are sustained, it is on the theory that the police power of the State has been properly exercised by the municipal authorities to which it was delegated. Police power cannot be exercised by any group or body of individuals who do not possess legislative power. . . . [A] group of citizens do not and cannot possess such power. When a municipal ordinance commits the exertion of the police power to the option of individuals to determine whether the use of property for a purely lawful purpose offends health, safety, or welfare, such ordinance violates the fundamental principles of police power. So-called consent ordinances in zoning legislation are of this type and have generally been declared unconstitutional. . . .
>
> Where an ordinance shows that a use is not opposed to public health, safety, morals, or general welfare, or is not a nuisance, and is in harmony with public interest and the general scope of the zoning ordinance, but the consent of a given set of individuals must be procured before land may be devoted to such use, the . . . consent provision is an unlawful delegation of legislative authority and discretion, with no rule or standard to guide those whose decision will control. It is not possible to check or correct the acts of the persons who may or may not consent; consent or refusal may be the result of favoritism,

18

> caprice, or malice, and no responsibility can be placed on those who act in the matter.

*Id.* at 307-08 (citing *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116 (1928)).

Notwithstanding this general rule, however, the *Perrin* Court reasoned that a gas station in a residential neighborhood was a nuisance *per se* that would normally be precluded under a zoning ordinance. Thus, the allowance of what amounted to an exception from the normal rule, by a *limited* delegation to a majority of owners, was permissible, based on a presumption that property owners would not consent, without good reason, to allow a nuisance in their own neighborhood. *See Perrin*, 156 A. at 307-08 (citing *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526 (1916), which upheld a similar consent provision regarding placement of billboards in residential areas). The *Perrin* Court further explained that in actuality, a party who must obtain neighbors' consent "may be benefited by this provision, for without it the prohibition would be absolute, and one was not in any way injured by the fact that consent for the proposed use of his property was required, where such consent referred to offensive structures." *Id.* at 308.

Here, by contrast, Ordinance 11-2016's consent provision purports to allow the Board of Supervisors to waive normally applicable review standards when adjacent landowners consent to *any use* other than a golf course, without regard to whether such use is a nuisance *per se* in the subject district or detrimental to the public health safety and welfare. Further, Ordinance 11-2016 also allows any adjoining landowner to arbitrarily retract such consent for any reason at any time. *See* Ordinance 11-2016, Section 913.F.2.a.ii.5, R.R. at 80a. Accordingly, *Perrin* and *Cusack* are inapposite.

Rather, this case is analogous to *Roberge*, in which an ordinance amendment allowed "philanthropic home[s] for children or for old people" in the residential zoning district at issue if two-thirds of nearby property owners consented. *Roberge*, 278 U.S. at 118. The proposed construction would have replaced an existing home for the aged poor with a more modern building able to accommodate more residents. *Id.* at 117. Exclusion of the new building was not necessary to the general zoning plan, nor was the proposed construction inconsistent with public health, safety, morals, or welfare. *Id.* at 121. In holding that the ordinance amendment unconstitutionally delegated legislative power, the United States Supreme Court observed that the ordinance allowed neighboring property owners, "uncontrolled by any standard or rule prescribed by legislative action," to withhold their consent: "They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the [requesting property owner] to their will or caprice." *Id.* at 122. Distinguishing *Cusack* as involving a use (a billboard in a residential area) that was offensive by its nature, the Court in *Roberge* concluded the ordinance's restriction requiring neighbors' consent for a philanthropic home, which was not offensive by its nature, was "arbitrary and repugnant to the due process clause" of the Fourteenth Amendment. *Id.* at 122-23.

Here, Subsections 913.F.2.a.ii.1-.5 of Ordinance 11-2016 specify the considerations the Board of Supervisors must apply when evaluating an application for change in Land Use Category or Land Use.[12] Those considerations vary depending on whether the proposed change in category or use will be more or less restrictive than the current category or existing use. Ordinance 11-2016, Section 913.F.2.a.ii.1-.4, R.R. at 80a. Of significance here, *the Ordinance gives the Board*

---

[12] *See supra* pp. 6-7.

*of Supervisors no discretion to waive these specified considerations, except upon the unanimous and revocable consent of all adjoining property owners:*

> 5. These additional standards may be waived by the Board of Supervisors, in their [sic] sole discretion, *if Applicant submits a petition signed by 100% of the adjacent property owners, within and outside the SD District, consenting to the proposed change in the Land Use Category and/or Land Use.* The petition must include as an attachment a copy of the revised Illustrative Site Plan and a description of the proposed change which must [be] presented to and explained to the adjacent landowner. *Any adjacent landowner may revoke their consent at any time.*

Ordinance 11-2016, Section 913.F.2.a.ii. 5, R.R. at 80a (emphasis added). Thus, Ordinance 11-2016 places control over the Board of Supervisors' authority to waive applicable review standards for change of Land Use Category or Land Use applications into the hands of a nongovernmental body – the adjacent landowners. The Ordinance gives the adjacent property owners unfettered power to decide whether the Board of Supervisors will have the option of waiving the applicable review standards in considering a zoning application. Notably, this power is delegated to adjacent property owners *regardless of what use* [other than a golf course] *is being proposed*, and thus, regardless of whether the proposed use is consistent with the public health, safety, and welfare and the requirements of Township's general zoning plan. Furthermore, under Ordinance 11-2016, adjacent landowners have unbridled discretion to determine the rules under which a use application will be evaluated: a set of rules under which the Board of Supervisors can waive the applicable review standards for a change of use, or a set of rules under which it must strictly apply the ordinance. There are no "necessary safeguards to guide and restrain the exercise of the administrative functions delegated" to the

21

adjacent landowners to guard against any adjacent landowner's arbitrary or capricious decision to change the applicable zoning ordinance provision from one which requires adherence to review standards to one which gives the Board of Supervisors the option to waive such standards, or to restrict later revocation of such consent. *425 Prop. Owners Ass'n*, 223 A.3d at 313 n.9; *see also Protz*, 161 A.3d at 834.

The impact of the consent provision at issue herein is to allow the adjacent landowners to determine whether one law or another should apply to a particular proposed use, without any of the "fundamental limitations" that our Supreme Court has deemed necessary. *Protz*, 161 A.3d at 834. Therefore, this provision represents an impermissible delegation of zoning authority. Accordingly, the trial court erred in denying Golf Club's substantive validity challenge to Ordinance 11-2016.

## IV. Conclusion

For the foregoing reasons, we reverse the Trial Court Decision. Due to our determination herein, we need not reach Golf Club's argument alleging procedural deficiencies regarding the notification/advertising of Ordinance No. 11-2016 or Golf Club's substantive validity claim that Ordinance 11-2016 represents spot zoning.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southpointe Golf Club, Inc.      :
     :
     v.      :
     :
Board of Supervisors of Cecil Township,:
and Southpointe Golf Club, Inc.      :
     :
     v.      :
     :
Zoning Hearing Board of Township      :
of Cecil      :
     :    No. 148 C.D. 2020
Appeal of: Southpointe Golf Club, Inc. :

# O R D E R

AND NOW, this 19th day of February, 2021, the January 14, 2020 Order of the Court of Common Pleas of Washington County is REVERSED.

_____
CHRISTINE FIZZANO CANNON, Judge